LIZZIE S. SANDFORD et al., executors, &c., of William M. Sand-
ford, deceased, complainants-respondents,

*v.*

AGNES M. WELLBORN et al., defendants-appellants.

[Submitted December 6th, 1915.   Decided March 6th, 1916.]

1. The opening of a decree in chancery, entered by default, rests in
the discretion of the chancellor, and a refusal to open such decree will
not be reviewed by this court where there is no abuse of such discretion
shown, and it is not the result of mistake or imposition practiced on
the court of chancery.

2. Notice to the defendant of an application for the issuing of an *alias*
execution in a foreclosure case is not required if such application be
made within six years of the entry of the decree.

On appeal from a decree of the court of chancery.

*Mr. Warren Dixon,* for the appellants.

*Messrs. Coddington & Blatz,* for the respondents.

The opinion of the court was delivered by

WILLIAMS, J.

This is an appeal from an order made by the chancellor as ad-
vised by Vice-Chancellor Griffin. No opinion was filed in the
court below, which necessitates the setting out of the facts in
detail.

The defendants, Agnes M. Wellborn and Charles E. Wellborn,
her husband, executed a bond and mortgage on lands in Somer-
set county to William M. Sandford, complainants' testator, dated
July 1st, 1911, to secure the payment of $10,000 in three years,
with interest at six per cent. per annum, payable semi-annually.
The bond contained the usual thirty-day-interest-default clause

37

and a tax-default clause. Six hundred dollars was paid in advance for interest to July 1st, 1912; on May 24th, 1913, $300 was paid for six months' interest due January 1st, 1913. William M. Sandford died December 30th, 1912, and the complainants qualified as his executors January 11th, 1913. On September 11th, 1913, a bill was filed to foreclose the mortgage, charging that six months' interest became due July 1st, 1913, and that defendants had defaulted in payment thereof for more than thirty days, and that complainants

"have elected and do hereby elect that the entire principal sum is now due and payable, together with all arrearage of interest, and that the entire principal sum so due and owing is the sum of $10,000 with interest from January 1st, 1913." ·

The default in payment of taxes was not charged, although the proofs show that there was clearly default in this also.

Process of subpœna, with ticket, was duly issued and served on the defendants, and on October 25th, 1913, a decree *pro confesso* was entered. On November 7th, 1913, a master reported that no part of the principal money had been paid, and that no interest had been paid since January 1st, 1913, and that by reason of the thirty-day-interest-default clause the entire principal of $10,000, and interest from January 1st, 1913, amounting to $511.17, had become due the complainants, the bond and mortgage having been produced, and the affidavit of William M. Sandford, Jr., taken. Final decree was entered November 8th, 1913, and on November 24th, 1913, execution was issued. This was held a short time by complainants' solicitors upon request of the defendant, Charles E. Wellborn, who said that he expected to make arrangements in a few days to settle the matter, but, upon learning that a large amount of taxes was due, he was notified on December 24th, 1913, that unless the taxes were paid the property would be advertised for sale. About this time $333 was received from an insurance company for a fire loss on the mortgaged premises, and Wellborn again promised to settle the matter in a few days and requested that the execution be held, which was done until January 15th, 1914, when the execution was sent to the sheriff, who advertised the property for sale. At

the request of Wellborn the sale was adjourned from week to week to March 30th, 1914, when a portion of the mortgaged premises was sold for $2,800, and a release was given by the complainants, their solicitor, William R. Coddington, Esq., receiving $2,120; the defendants' solicitor, James L. Griggs, Esq., retaining $680 to pay taxes past due.

Mr. Coddington requested of Mr. Griggs a statement showing how the $2,120 should be applied, and a few days later received from Mr. Griggs the following:

"WHEREAS, I have this day sold to John M. Hallock a strip of land covered by the mortgage and decree of the complainant in the above-entitled matter for the sum of twenty-eight hundred ($2,800) dollars;

"AND WHEREAS, the sum of six hundred and eighty ($680) dollars has been retained by my attorney, James L. Griggs, for the purpose of paying the taxes due and unpaid against said premises, leaving a balance of the purchase price of twenty-one hundred and twenty ($2,120) dollars:

"Now, THEREFORE, I, Agnes Wellborn, do hereby authorize and request William M. Sandford, Jr., the executor, to distribute said $2,120 in the following manner, that is to say:

| | | |
|---|---:|---:|
| "Interest on said mortgage to April 1st, 1914.... | $417 | 00 |
| "Tax costs .............................. | 137 | 83 |
| "Sheriff's fees ............................ | 99 | 82 |
| "To W. R. Coddington for services........... | 50 | 00 |
| "To J. T. Vail on account of his claim........ | 115 | 35 |
| "To James L. Griggs, my attorney........... | 100 | 00 |
| "To the executor of Wm. M. Sandford, deceased complainant ...:....................... | 1,200 | 00 |

"And this shall be your sufficient authority for so doing.

"Given under my hand this thirtieth day of March, nineteen hundred and fourteen.

"AGNES M. WELLBORN, [L. S.]

"Signed, sealed and delivered in the presence of Chas. E. Wellborn."

It is claimed by the appellants that this was not executed until December 20th, 1914, but the proofs clearly show that it was executed a few days after March 30th, 1914, and the confusion probably arises from the fact that there is another statement, hereinafter referred to, dated December 20th, 1914. It will be noted that the payment of $417 for interest to April 1st, 1914, with the payment of $333 received from the insurance money, making $750, would be the exact amount of interest from Jan-

nary 1st; 1913, the date fixed in the master's report, and is an admission by defendants that at the time the bill was filed interest was in default as claimed therein.

Mr. Coddington was informed by Mr. Wellborn and his solicitor at this time that there was a prospective purchaser for the balance of the property, and was asked to have the execution returned unsatisfied so as to avoid further adjournments and costs, and the entire amount due would be paid in a few weeks. The execution was accordingly returned by the sheriff into court endorsed "Apr. 21, 1914, returned unsatisfied at request of solicitors."

The balance of the property was not sold by the defendants and nothing more was paid on the decree. A petition for an alias execution was filed October 9th, 1914, and on that day an alias execution was issued for $9,119.87 ($8,800 for balance of principal due; $50 for insurance premium paid, and $269.87 for interest from April 1st, 1914, to October 5th, 1914), directing the sheriff to sell the balance of the mortgaged premises. The property was again advertised to be sold, November 16th, 1914. At the request of defendants, adjournments were made from week to week; the defendants claimed that a payment of $300 interest had not been credited, and that this was paid by check through the bank at Dunellen, New Jersey, but the check was not produced in evidence. About November 24th, 1914, in the office of Mr. Griggs, this matter was discussed by counsel of both parties, and Mr. Coddington testifies that Mr. Griggs promised that if the sale should be adjourned to January 4th, 1915, the amount claimed to be due would be paid on or before that date, or that, in the event of failure to pay the same, there would be no objection made to the sale taking place; that he informed Mr. Griggs that he did not care to have the accusation made that interest had been paid the complainants, when the same had not, and that, if the sale was postponed, an agreement must be executed by defendants embodying in said agreement the pledge to pay said money on or before January 4th, 1915, or make no further objection to the sale, and that Mr. Griggs immediately dictated to his stenographer the following agreement:

"WHEREAS, execution in the above-entitled matter has been issued to the sheriff of the county of Somerset and the premises described therein are now advertised for sale;

"AND WHEREAS, Agnes H. Wellborn and Charles E. Wellborn, her husband, two of the defendants in said matter and owners of said property are desirous of having said sale postponed from week to week to January fourth. nineteen hundred and fifteen.

"NOW, THEREFORE, in consideration of said adjournments being made, we the said Agnes M. Wellborn and Charles E. Wellborn, her husband, do hereby agree to and with the complainants to pay the amount due mentioned and specified in said execution, together with interest and costs on or before January fourth, nineteen hundred and fifteen, and in case we fail to make said payment as herein provided (said sale being adjourned from week to week to said date), and in that case we consent that the sheriff of the county of Somerset proceed to sell the said premises as in said execution directed, and in consideration of the premises we hereby admit that the amount claimed to be due as specified in said execution is correct.

"WITNESS our hands and seals this twentieth day of December, A. D. nineteen hundred and fourteen.

　　　　　　　　　　　"CHAS. E. WELLBORN,　[L. S.]
　　　　　　　　　　　"AGNES M. WELLBORN,　[L. S.]"

The sale was adjourned to January 4th, 1915, and on that day defendants paid $800 on account of the principal, and under promises of defendants that balance would be paid in a few days, sale was adjourned from week to week. On March 11th, 1915, the defendants presented a verified petition in this cause, praying that the said decree in foreclosure be opened; that they have leave to answer the bill; that the master's report be set aside, and that the sheriff might be restrained from selling the mortgaged premises. Upon filing this petition the chancellor allowed an order to show cause and restrained the sheriff from making sale of said lands until the further order of the court. On September 7th, 1915, an order was made dismissing the petition of defendants, vacating the order to show cause, and removing the restraint from the sheriff, and it is from this order that this appeal is taken.

The appellants contend that this order was made upon the affidavits presented, without the hearing of witnesses on the allegations of the petition and without affording an opportunity of cross-examination of witnesses. Whether the chancellor will open a decree after enrollment is a discretionary matter; the disposition of the matter summarily, on affidavits, after full argu-

ment, as in the present case, is in accordance with chancery practice.

It is also contended that upon the return of the execution unsatisfied, April 21st, 1914, with $8,800 due for principal and interest paid to April 1st, 1914, the parties, pending litigation, had entered into a new or different agreement affecting the subject-matter of the suit, from that set out in the bill of complaint, which agreement estopped complainants from proceeding under the original decree. From an examination of the proofs it is clearly evident that the complainants returned the execution, not with the intention in any way as a settlement of the decree, but to avoid the expense and trouble of adjournments while waiting for the defendants to keep their promise to pay the balance due in a few weeks. It is true that one of the complainants wrote, on June 1st, 1914, to the defendants that "the mortgage we hold against your Weston farm, which now stands at $8,800, will be due July 1st, 1914. You are hereby notified to pay said mortgage in full on or before July 1st next," but he had written, on May 16th, 1914, "can you advise me definitely as to when the mortgage I hold on your farm will be paid off, or have all the sales fallen through?" There is no doubt that he was referring to the promises of defendants to pay in a few weeks, from the sale of the property by them, at the time the execution was returned, and his reference to "mortgage" was intended to refer to the amount due in the decree.

In *Hudson Trust Co.* v. *Boyd, 80 N. J. Eq. 267*, the chancellor says: "Now, the mortgage is very effectually continued when merged into a decree of foreclosure, which can be enforced by execution at any time within twenty years (on notice to the defendant after the lapse of six years), and, under the terms of the decree, the defendants are not foreclosed of the equity of redemption until the premises are actually sold by virtue thereof. In fact, when merged into a decree the debt which before was one by *specialty* becomes one of *record.*" The defendants cannot contend that the return of the execution "unsatisfied" was a satisfaction of the decree, and that the mortgage thereby became in existence with $8,800 due, for principal, with interest from April 1st, 1914.

We think the contention of the complainants is the proper one, and the intention was by returning the execution "unsatisfied," to rely on their decree for security with the right to issue an *alias* execution, if necessary. The proofs do not bear out the statement of Mr. Griggs that, as he understood the matter, at the time of the payment of $1,200, as set out in the agreement of March 30th, 1914, the balance "should remain as a permanent investment, to be secured either by the decree or a new mortgage." This is denied by Mr. Coddington, who says that at this time he was informed by Mr. Wellborn and Mr. Griggs, his attorney,

"that they had a prospective purchaser for the entire balance of the tract at a good price, which would enable them to pay off the entire mortgage, and asked deponent to have execution returned unsatisfied so as to avoid further adjournments and costs, and that the amount would be paid in a few weeks."

The proofs appear to bear this out, for thereafter the complainants were pressing for payment until the new execution was issued. But even if it is admitted that the parties entered into a new agreement, as claimed, which would estop the complainants from proceeding with the original suit, the defendants are estopped by their own signatures in the agreement of December 20th, 1914, as to any claim that the time of payment was extended or the amount stated in the execution is wrong, and by agreeing therein to pay the debt and consenting to a sale. The mere fact that a payment was made after the first execution was issued would not require a new decree, answer and adjudication, before an *alias* could be issued; it is merely a matter of calculation. As to a portion of the lands having been released, it was quite proper to limit the execution to the part remaining unsold.

It is objected that no notice was given of the application for the *alias* execution. Section 88 of the Chancery act of 1902 (*P. L. 1902 p. 539*) provides:

"Execution may issue, without a revival of the decree, at any time within twenty years from the date of such decree; provided, the parties to the decree, or those of them during whose lives execution may now issue without a revival, be then living; and provided further, if more than six years have elapsed since the entering of the decree, a special

order of the court shall be necessary before the execution issue to be made upon ten days' notice to the defendant of the application therefor, and proof to the satisfaction of the court of the amount remaining due upon the decree."

The conditions of the present case did not require notice to be given.

The appellants also contend that at the time of filing the bill to foreclose, the principal was not due, as the interest was not overdue. This depends upon whether a payment of $300, which defendants claim was made in December, 1912, was in fact made. The only testimony to support this is the affidavit of Charles E. Wellborn, who swears that in December, 1912, he desired to borrow $2,000 additional from Mr. William M. Sandford, and went to his residence with Mr. William Von Seidlitz, whose farm he had just sold, with Mr. James T. Vail, and was closing up the matter; that he obtained from Von Seidlitz the money to pay Mr. Sandford, and they entered the residence and met Mrs. Sandford, who told him that Mr. Sandford had suffered another stroke, but suggested that he could see him for a few moments and directed him to the room where he was lying in a bed-chair; his secretary, or chauffeur, was present, who pushed his chair a little nearer the window and then left the room; that he explained the nature of his business and handed out $300 in bills, which Mr. Sandford received and then said he could not make the additional loan of $2,000, but might do so if he got better; that said $300 was part of $500 paid to him by Von Seidlitz on that day for a commission; that said Von Seidlitz is now out of the state, but deponent expected to produce him in a short time, and is now endeavoring to get in touch with him. No affidavit was produced from Von Seidlitz, or from James T. Vail, whom he mentioned.

Mrs. Lizzie S. Sandford, widow of William M. Sandford, swears that her husband died December 30th, 1912; that, for several months prior to his decease, he had been failing in health; that, during the month of December, 1912, he was unable physically to transact business; that he did not pretend to or attempt to transact business with anyone during that month, unless deponent or some other member of the family were

present; that, as to the statement of Charles E. Wellborn, that he called at the home of said William M. Sandford, in the month of December, 1912, and paid to said William M. Sandford the sum of $300 in the presence of one William Von Seidlitz, she is positive that neither Mr. Wellborn or said Mr. Von Seidlitz was at the home of William M. Sandford during the month of December, 1912; that she was home with her husband during the entire month, and that, had Mr. Wellborn and Mr. Von Seidlitz been there, she would have known it; that her said husband was confined to his bed nearly all the time during the entire month of December; that the said William M. Sandford had had several strokes of paralysis, and that he was paralyzed during the month of December, 1912, that it was physically impossible for him to help himself, and required the assistance of his wife or nurse whenever he was moved about the room, which was seldom done; during the entire month of December, 1912, the said William M. Sandford was physically unable to work or to move about the room without assistance; that her position in the care of her husband was such, during the month of December, 1912, that had the said Charles E. Wellborn or William Von Seidlitz been to the house, she would have seen them, and known; that for a year or more prior to the death of her said husband, her husband was unable to alone attend to his business affairs; that he kept his papers at his home, and that she, whenever they were required, would go to the safe and procure the papers and take them to her husband, and transact whatever business was necessary to be transacted.

Joseph Dunlap swears that he was employed as chauffeur for Mr. Sandford from January 20th, 1911, to January 20th, 1913; that he has had read to him the affidavit of Charles E. Wellborn; that he was the only chauffeur, or secretary, in Mr. Sandford's employ during the period he was there; that during the month of December, 1912, Mr. Sandford was seriously ill, and, in the opinion of deponent, physically unable to transact any business; that as to the statement of Charles E. Wellborn, contained in said affidavit, that he, with Mr. Von Seidlitz, called at the residence of Mr. Sandford, and came into his bedroom while he, deponent,

was seated therein, is not true; that he was not in Mr. Sandford's bedroom, or in any room, in the residence of Mr. Sandford during the month of December, 1912, or at any other time, when Mr. Wellborn and Mr. Von Seidlitz, or either of them, were present.

William M. Sandford, Jr., swears that Charles E. Wellborn was not at the house of William M. Sandford in December, 1912, and never paid $300 to cover interest from July 1st, 1912, to January 1st, 1913; that at that time his father was physically incapacitated and unable to transact any business without assistance; that he could not dress himself, or move from his bed without assistance; that he was confined to his home and bedroom, but that, occasionally, he was moved to the adjoining room, with the assistance of his wife, nurse, or other members of his family; that, at that time, and for a long period prior to said time, he has personally looked after the business of his said father, would go to his father's home almost every evening, and transact whatever business required to be transacted; that had the said Charles E. Wellborn been at the home of his father during said month of December, 1912, with one William Von Seidlitz, as alleged by said Charles E. Wellborn, deponent would have known of said visit; that deponent never saw or heard of a party by the name of William Von Seidlitz until he read the affidavit of petitioner.

We have examined carefully the testimony of Mr. Wellborn in this cause; he attempts to prove another payment of $300 for interest by a check on the Dunellen bank, but the check is not produced. Mr. William R. Coddington swears that the statement of Charles E. Wellborn, that $333 was not credited on the bond until late in the fall of 1914, is *untrue,* and his statement that there was credit on said bond of $300, under date of January 16th, 1914, is *untrue,* said bond had been in Mr. Coddington's possession since the filing of the bill; that the statement of Mr. Wellborn as to how the moneys paid by Hallock for the portion of the premises released from the lien of said mortgage were to be paid, is *untrue.* Statements as to the master's report not being on file in Trenton were, to say the least, careless, as

the report was no doubt on file at the proper time, and still is, as appears by the endorsements thereon. In our opinion, his testimony should be given little, if any, credence; and the evidence clearly shows that the principal of the mortgage was due at the time of filing the bill, by reason of default in interest.

It is well settled that the court of chancery has discretionary power, even after enrollment, to open a regular decree obtained by default for the purpose of giving the defendant an opportunity to make a defence on the merits, where he has been deprived of such defence, either by mistake or accident, or by the negligence of his solicitor. This has been expressly determined in this court in *Day* v. *Allaire, 31 N. J. Eq. 303, 315.* In this case an answer was interposed by the defendant and testimony taken, but her solicitor abandoned the case without her knowledge, omitting and refusing to take testimony of several material witnesses, and did not present the evidence taken or argue the case before the chancellor; in that sense the decree was taken by default. In the case *sub judice* there was no surprise, the subpœnas were duly served, and that of one of the defendants, James T. Vail, was acknowledged by his solicitor, who was also solicitor of appellants; there was no merit as appears from the proofs; and there was no neglect on the part of defendants' solicitor, as he informed defendants of every step taken, and each action was with their concurrence.

In *Embury* v. *Bergamini, 24 N. J. Eq. 227,* it was held that a decree by default, after an enrollment, would be opened "for the purpose of giving the defendant an opportunity to make a defence, where such defence is meritorious and he has not been heard in relation thereto, either through mistake, accident or surprise." In the present case, the defence is not meritorious and the defendants have not been prevented from being heard either through mistake, accident or surprise.

A final decree will not be opened to let in a defence, where, from the evidence submitted, it appears that the evidence to sustain such defence would be insufficient to overcome that on which the decree was founded. *Morris* v. *Hinchman, 32 N. J. Eq. 204.*

In *Miller* v. *Hild, 11 N. J. Eq. 25,* it was held that the court will open a decree obtained by surprise, but not where a party has had notice of the suit and has had an opportunity of making his defence, and has neglected doing so.

In *Williams, Jr.,* v. *Lowe,* 79 N. J. Eq. 173, it was held that "whether or not a final decree shall be opened is discretionary in the court of chancery and where an order refusing to open a decree was neither an abuse of such discretion nor the result of mistake or of any imposition practiced on that court, this court will not review such order for the mere purpose of substituting its discretion for that of the court of chancery."

The order refusing to open the decree in the case *sub judice* was neither an abuse of such discretion nor the result of mistake or of any imposition practiced upon the court below.

Our conclusion is that the appellants have not shown themselves entitled to open this decree for the purpose of making a defence on the merits; the proofs do not show a meritorious defence, nor have they been deprived of such defence by mistake, accident or surprise, or by neglect of their solicitor; to permit them to do so would be to put a premium, not only upon carelessness and laches, but upon lack of honesty and the avoidance of the obligations of a written paper admitting that what they now claim as to payment of interest is false; nor has there been shown any abuse of the discretionary power of the court below in refusing to open the decree. The order dismissing the petition of defendants, vacating the order to show cause, and removing the restraint from the sheriff, is affirmed, with costs.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER BERGEN, MINTURN, KALISCH, BLACK, WHITE, TERHUNE, HEPPENHEIMER, WILLIAMS, TAYLOR—14.

*For reversal*—None.