The complainant filed his bill under an act entitled "An act to compel the determination of claims to real estate in certain cases, and to quiet the title to the same." 4 Comp. Stat. p.5399.
The following facts appear: On May 1st, 1878, Judd and Buckingham conveyed to Thompson and wife certain lands in Jersey City, taking back a bond and purchase-money mortgage in the sum of $3,000, payable in installments of $600 a year on the 1st day of May in each year succeeding the date of the mortgage. On the 19th day of March, 1881, Judd and Buckingham assigned said mortgage to Alfred Heritage et al., surviving executors of the last will and testament of Joseph N. Scott, deceased, late of the city of New York. The mortgagors having failed to pay the installments due on the *Page 516 
mortgage, the above-named executors filed their bill in this court on May 22d 1882, for the foreclosure of said mortgage, and a final decree was entered therein on August 15th, 1882, at the foot of which decree is the following:
"And it is further ordered, adjudged and decreed that the defendants stand absolutely debarred and foreclosed of and from all equity of redemption of, in and to the said mortgaged premises when sold as aforesaid by virtue of this decree."
About the year 1882 the mortgagors (who had lived in the premises) moved to New York, and the complainants in the foreclosure suit entered into possession, renting the same, collecting the rents, paying the taxes and making repairs, and such possession has continued in complainants in the foreclosure suit, and the present complainant, who was appointed administrator with the will annexed of Joseph N. Scott, deceased, after the death of the last survivor of the executors appointed by the will of Mr. Scott. On or prior to 1917, an adjoining owner discovered that his building encroached on the premises in question, and sought a deed from the complainant. The question was then raised as to whether the complainant had a good title. Thereupon, complainant filed his bill to foreclose the above-mentioned mortgage on the 25th of October, 1917. This suit remained in abeyance until September 2d 1921, when the bill was dismissed on motion of the complainant's solicitor. No subpoena had been taken out and no answer filed. Thereafter, on October 25th, 1921, the complainant filed the bill in this cause.
The defendants deny that the executors of Scott entered into possession of the premises as mortgagees, but, on the contrary, say that they entered into possession under an agreement with Thompson, the mortgagor, to collect the rents and apply them to the mortgage indebtedness represented by the decree in foreclosure, and that if an opportunity to sell the premises at a good price presented itself, the executors or Thompson should sell the premises and apply the proceeds upon the mortgage indebtedness, or the balance *Page 517 
thereof, and, if anything thereafter remained, to pay the same to the said Thompson. To support this theory it was shown that on November 16th, 1882, some three months after the decree had been entered, Thompson made a contract to convey the premises in question to one Wohlleben for the sum of $3,800, which contract had been recorded. This Thompson had a perfect right to do, because the equity of redemption had not, at that time, been barred. I may add that afterwards, on the 5th of March, 1883, Wohlleben, in order to clear the title of the cloud created by the recording of the contract, executed to Thompson a release of all interest acquired by him under said contract.
Mrs. Adalyn M. Phillips, a granddaughter of the mortgagor, Thompson, testified that she heard a conversation, in the spring of 1883, between Mr. Heritage, the then executor, and Mr. Thompson, the mortgagor, in which Mr. Thompson said, "I am awfully sorry to bother you, Heritage, but I didn't know how soon I would be able to get out and I wanted this thing straightened up," and Mr. Heritage said, "I am sorry, Mr. Thompson, that your deal fell through." She said, "Grandpa, I think, had been trying to sell the house." This apparently referred to the Wohlleben contract. She said, further, "Grandpa said that he would like to have Mr. Heritage collect the rents and apply them on the debt." She said her grandmother, at this time, said that they were "homesick for the place; she was very fond of flowers, and she would like to get back there and have her flowers again. Mr. Heritage said `that is all right; I guess we can patch things up nicely,' and he and grandpa talked and they seemed to straighten the thing all out." She further says, "When grandpa said I would like to have you collect the rents and apply them on the debt, Mr. Heritage said, `why, I think that will be all right; I am willing.'" She said further, "Grandpa said `in the meantime, if either of us have a chance to make a good deal and sell the house, we will do so and straighten it up, and I will get what is coming to me,' and that is the way it was left. Mr. Heritage said, `that suits me all right.'" Her grandfather died about 1895. *Page 518 
No further evidence was offered to support the agreement set out in the answer. At the time that Mrs. Phillips heard this conversation she was about ten or eleven years of age. She was a very intelligent witness, seemed very frank and clear in her testimony, and greatly impressed me with her desire to tell the truth, but I am inclined to the view that, after a lapse of forty years, it would be very difficult for her to remember with reasonable accuracy a conversation heard by her when a child so young. Such testimony, after such a lapse of time, when all the parties who had knowledge of the transaction are dead, should not be permitted to defeat a title which vested in the Scott estate more than twenty years before. Mr. Thompson died in 1895, and from 1883 to 1895 it does not appear that he ever asked for an accounting, or made any inquiry with respect to the premises, and, in fact, from the time that the Scott estate went into possession down to 1917, when the Scott estate sought to obtain a deed from the defendants to remove a cloud on its title, neither Mr. Thompson in his lifetime, nor his heirs after his decease, made any inquiry regarding these premises, and apparently were unaware of any right therein.
But it is urged that the complainant and his predecessors could not hold as mortgagees in possession because the mortgage merged in the final decree. While it is true that the mortgage merged in the final decree (Hudson Trust Co. v. Boyd (ChancellorWalker), 80 N.J. Eq. 267; Sandford v. Wellborn (JudgeWilliams, Court of Errors and Appeals), 85 N.J. Eq. 577;Bradley v. Atlantic Guarantee and Title Ins. Co. (ChancellorWalker, Court of Errors and Appeals), 121 Atl. Rep. 626), yet such merger does not operate to divest the mortgagee of the right to enter into possession as mortgagee.
In Hudson Trust Co. v. Boyd, supra, the chancellor said: "Now, the mortgage is very effectually continued when merged into the decree of foreclosure, which can be enforced by execution at any time within twenty years [on notice to defendant after the lapse of six years], and, under the terms of the decree, the defendants are not foreclosed of the equity *Page 519 
of redemption until the premises are actually sold by virtue thereof." But this merger does not destroy every right of the mortgagee under the mortgage. The chancellor says that the mortgage "is effectually continued when merged into the decree of foreclosure" — effectually continued for what purpose? It is unlike a judgment on the bond, where a complete merger takes place. In Howard Savings Institution v. Essex Building andLoan Association, 46 Atl. Rep. 223, Vice-Chancellor Emery said: "While the amount of the indebtedness on the mortgage is ascertained by the decree, there is no decree for payment otherwise than by a sale of the mortgaged premises, and no action can be maintained on the decree to recover the amount due. In this respect the decree in a foreclosure suit differs in toto
from an action on the bond at law, where the bond is merged in the judgment — a higher security for the original debt, and itself the basis of an action. Nor is the estate itself of either the mortgagor or mortgagee under the mortgage changed, ipsofacto, by virtue of the final decree, which, in its terms, only affects this estate by directing a sale to pay the debt, and, so far as the estate in the land is concerned, provides that the defendant's rights shall be foreclosed when sold under the decree." In this latter case the vice-chancellor thought that thedictum in Lewis v. Conover, 21 N.J. Eq. 230, that the mortgage was merged in the decree, was not sustained by any reasoning or authority cited, and, in view of the subsequent decision in Deshler v. Holmes, 44 N.J. Eq. 585, must be considered as not declaring the true rule. In view of the later decisions above cited, the statement of the vice-chancellor that the mortgage is not merged in the decree must be considered as overruled. But, in view of the language of the chancellor that the mortgage is very effectually continued when merged into a decree of foreclosure, and the language cited from the opinion inHoward Savings Institution v. Essex Building and LoanAssociation, supra, as to the character of the decree and its effect upon the rights of the mortgagor and mortgagee, I have reached the conclusion that the merger by the decree did not operate to prevent the mortgagee from entering *Page 520 
into possession as such, and, being in possession for more than twenty years (namely, thirty-nine years), my conclusion is that, under the eighteenth section of an act entitled "An act for the limitation of actions" (3 Comp. Stat. p. 3170), which reads as follows: "That if a mortgagee, and those under him, be in possession of the lands, tenements and hereditaments contained in the mortgage, or any part thereof, for twenty years after default of payment by the mortgagor, then the right or equity of redemption therein shall be forever barred," the right or equity of redemption of the defendants in this case is forever barred.
I will advise a decree for the complainant.